1
2
3
4
5
6
7
8
## UNITED STATES DISTRICT COURT
9
## SOUTHERN DISTRICT OF CALIFORNIA
10
11  EDWARD YBARRA,                                   Civil No.    09-cv-1188 LAB (AJB)
12                                  Petitioner,
                                                     Report and Recommendation Denying
13  v.                                               Petitioner's Habeas Corpus Petition and
                                                     Order Denying Petitioner's Evidentiary
14  M. MARTEL, Warden,                               Hearing Request.
15                                  Respondent.      [Doc. Nos. 1, 20, 27 and 28]
16

17        Edward Ybarra, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus

18  [hereinafter "Petition"] pursuant to 28 U.S.C. § 2254, [Doc. No. 1], challenging the sentence for his

19  February 10, 2005 conviction in California Superior Court, San Diego County, Case No.

20  SCD181115 and SCD160811.  Petitioner was convicted of making a criminal threat, vandalism,

21  battery, and attempt to prevent a witness from testifying.  The trial court found that Petitioner had

22  three prior prison convictions, two serious felony prior convictions, and two prior strike convictions

23  and the California Superior Court sentenced Petitioner to a term of 61 years to life.  Respondent

24  filed an answer to the Petition in accordance with Rule 5 of the Rules Governing section 2254 cases

25  in the United States District Court. [Doc. No. 20].  The Petitioner filed a Motion for an Evidentiary

26  Hearing and a Traverse. [Docs. No. 27, 28]. After a thorough review, this Court RECOMMENDS

27  that the Petition for writ of habeas corpus be DENIED and DISMISSED.  The Petitioner's request

28  for an evidentiary hearing is DENIED.

**Procedural History**

Petitioner was convicted by a jury on November 10, 2004 in the California Superior Court, San Diego County, Case No. SCD181115 and SCD160811 for the following crimes: making a criminal threat (count one, Cal. Penal Code § 422), vandalism (count two, Cal. Penal Code § 594 (a)(b)(2)(A)), battery (count three, Cal. Penal Code § 242), and attempt to prevent a witness from testifying (count four, Cal. Penal Code § 136.1 (a)(2)).  On February 10, 2005, the trial court found true three prison priors, two serious felony prior convictions, and two prior strike convictions within the meaning of the three strikes law (Cal. Penal Code §§ 667(a)(1),(b)-(i), 667.5(b), 668, 1170.12). Petitioner was sentenced to sixty-one years to life for the four convictions.

Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District Division One, claiming that the trial court erred by: (1) admitting the victim's 911 call that the petitioner "had killed people," (2) staying rather than striking the two § 667.5(b) one-year prior prison enhancements when it imposed two 5 year § 667(a) enhancements for the serious felonies resulting in the prison terms; and (3) failing to exercise its discretion to strike prior strike convictions on a count by count basis. [Lodgement 7.]  On March 1, 2007, the Court of Appeal agreed that § 667.5(b) enhancements should be stricken rather than stayed, but affirmed the judgment in all other respects . [Lodgement 7.]  The Court found that there was substantial evidence to sustain Petitioner's conviction and that the trial court properly denied his motion for new trial because the trial court did not abuse its discretion by allowing 911 statements for the purpose of proving the declarant's state of mind. [Lodgement 7.]  The Court also found that it is improper to impose both a § 667 (a) serious felony enhancement and a § 667.5 (b) enhancement based on the same serious felony, that the trial court was within its discretion to decline to strike his prior convictions, and that the Petitioner was within the intended scope of the three strikes law. [Lodgement 7.]

Petitioner then filed a petition for review in the California Supreme Court raising the argument that the trial court abused its discretion by permitting the prosecution to introduce the 911 statements into evidence. [Lodgement 8.]  The Court denied his petition on May 18, 2007. [Lodgement 9.]

Petitioner filed a petition for Writ of Habeas Corpus in the California Superior Court on January 28, 2008 claiming: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) trial court misconduct; and (4) prosecutorial misconduct. [Lodgement 12.] The California Superior Court, San Diego County denied the petition on March 14, 2008. [Lodgement 13.]  On April 1, 2008, Petitioner filed the petition with the California Court of Appeal, Fourth District making the same claims. [Lodgement 14.]  The petition was denied by the California Court of Appeal on October 21, 2008. [Lodgement 15.]  The petition was filed with the Supreme Court of California on November 4, 2008 (case no. S168025), the Court denied the petition on May 13, 2009. [Lodgements 16, 17.]

The instant habeas corpus petition (case no. 09-cv-01188) was filed on June 1, 2009 and raises the same four claims. [ Doc. No. 1.]  Specifically, the Petitioner contends that (1) his trial counsel was ineffective because the attorney failed to subpoena and cross-examine the police officers responding to the 911 call and failed to redact statements from the 911 call to omit the references to his parole status and that he was going to shoot the man who had driven the victim home; (2) his counsel on direct appeal was ineffective because she failed to "comb the records" for error by the prosecutor and the trial judge; (3) the trial judge engaged in misconduct by allowing the 911 tapes to be played in the jury room; and (4) the trial prosecutor engaged in misconduct by eliciting perjured testimony.

Petitioner submitted a motion for an evidentiary hearing on January 5, 2010.  Petitioner wishes to obtain evidence on the 911 tapes as part of discovery with the goal of proving: (1) his trial attorney failed to redact the tapes, and (2) a substantial and injurious error by the trial judge occurred when the judge allowed the tapes to be replayed to the jury during deliberation without additional instructions. [Doc. No. 27.]  Petitioner also seeks an evidentiary hearing to obtain evidence from the police officers who responded to the call on February 9, 2004.

**Factual Background**

The following statement of facts is taken from the court of appeal opinion affirming Petitioner's convictions on direct review.  People v. Ybarra, unpublished opinion (Cal. Ct. App., 4th Dist., Div. 1, March 1, 2007).  This Court gives deference to state court findings of fact and

1   presumes them to be correct.  See Sumner v. Mata, 449 U.S. 539, 545-47 (1981) (stating that

2   deference is owed to factual findings of both state trial and appellate courts).

3       In June 2003, Ybarra met Blanca Ibarra through his sister.  Ibarra's husband was ill
    and she needed a handyman to do some work at her home, a trailer.  Ybarra offered to
4   help and she hired him to do some work in September.  Ybarra befriended Ibarra's
    husband, who was housebound, and he would visit about three times a week, bringing
5   beer and cigarettes.  When Ibarra told Ybarra not to bring cigarettes because her
    husband had emphysema and was not supposed to smoke, Ybarra laughed and
6   mocked her.

7       Ybarra started calling Ibarra "darling" or "baby" and looked at her in "a very dirty
    way."  He called her all the time, asking her what she was doing.  One time he called
8   and told her he had some of her panties.  On more than one occasion, Ibarra saw him
    going through her things.  She told him to return the items he had taken and when he
9   did, she told him to leave and not return.

10      Ibarra's husband died on December 28, 2003.  About a week and a half after his
    death, Ybarra called.  He said he had just learned about her husband's death and
11  wanted to give her a rosary and some candles in commemoration.  She agreed when
    Ybarra promised to behave properly.  He came over that day, bringing six candles
12  and a rosary.  They lit the candles, prayed, and talked about her husband.  When she
    told him she did not feel well and asked him to leave, Ybarra remained in the house
13  and started to tell her that her husband had asked him to look after her.  Ibarra told
    him that was "nonsense," not true, and again asked him to leave.  They argued.
14  Ybarra became furious, broke all the candles, burned a comforter, and yelled at her,
    "Why don't you let me stay here with you so you can feel better?"  He pushed her
15  onto the bed and said he was leaving and would have his mother pick him up.  Ybarra
    remained in the trailer for about four hours after he was asked to leave.
16
        Thereafter, Ybarra continuously called Ibarra, asking how she was and if she needed
17  anything.  He came over to the trailer even when she told him she did not want to see
    him.  Sometimes he would be in the trailer when she arrived home.
18
        On February 4, 2004, Ibarra arrived home about 10:00 p.m., after having gone
19  shopping and receiving a ride home from a friend, Robert Barela.  Ibarra's nephew
    was then living with Ibarra in the trailer.  Ybarra was inside the trailer.  He was very
20  angry and started yelling at Ibarra, asking her whom did she come home with.  When
    she told him Barela had given her a ride, Ybarra slapped her so hard she fell to the
21  floor.  She called for her nephew who came out of his bedroom and saw Ibarra lying
    on the floor.  Ibarra was crying and in pain, and the nephew told Ybarra to leave.  The
22  police were called and when they arrived at the residence, they told her that Ybarra
    was very dangerous and that "he always wanted to hit people."  This information
23  made Ibarra even more afraid of him.

24      After this incident, during February and March 2004, Ybarra seldom called.
    Sometime during this period, Ybarra's mother came to Ibarra's trailer when Barela
25  and other people were present.  Ybarra's mother wanted to speak privately to Ibarra
    so they went outside.  Ybarra's mother was crying and very nervous.  She told Ibarra
26  to hide, that her son was doing very badly, was on drugs, and had taken a bat with
    which he intended to kill Ibarra.  She urged Ibarra to stay inside her home.  Barela,
27  who knew Ybarra's mother, came outside and heard parts of the conversation.

28      On March 3, 2004, Ibarra was in her trailer packing items because she was moving.
    Geovanni Romero and his girlfriend were there helping Ibarra when Ybarra called.

-4-

Ibarra's demeanor immediately changed and she was upset and yelling. She told Ybarra to stop calling her. At Romero's request, Ibarra handed the phone to him. Romero told Ybarra he wanted to see him face-to-face to see if he was man enough to hit a woman - Romero was aware Ybarra had hit Ibarra. Ybarra said he was coming over immediately and hung up the phone. Ibarra was afraid but she did not want to leave the trailer because the door was not secure and her personal belongings were inside.

About an hour later, Ybarra called again. He was very angry, calling her a "fucking whore," said he was going to come over to Ibarra's house and that they were "going to fly." "Fly" is used in Mexican slang to mean die; Ibarra interpreted Ybarra's statement to mean she was going to die. Ibarra was "completely afraid." She believed Ybarra was making a serious threat and intended to harm her.

About 45 minutes later, Ybarra called again while he was standing outside her trailer. Ybarra said, "Are you ready, whore?" He broke three of the windows in her trailer. Romero ran outside. Ibarra's nephew and his friend had just arrived and saw Ybarra running away. Romero, the nephew and nephew's friend unsuccessfully tried to find Ybarra. Romero's girlfriend dialed 911. During the 911 call, Ibarra described Ybarra as "crazy" and stated, "He, uh, has killed people."

Ibarra was subpoenaed to testify at Ybarra's preliminary hearing on March 22, 2004. She came to court with Barela, her nephew, Romero and Romero's girlfriend. When she saw Ybarra inside the courtroom, she became afraid. Criminal proceedings were suspended for an examination to determine Ybarra's mental competency, later reinstated, and the preliminary hearing was rescheduled for May 3, 2004.

Ibarra received another subpoena to testify at the preliminary hearing on May 3, 2004. Before that hearing, Ybarra's mother visited her and, as a result of her conversation with Ybarra's mother, Ibarra was afraid and believed she would be harmed if she testified. She did not testify at the preliminary hearing. Nonetheless, following the preliminary hearing, Ybarra was held to answer on all counts.

Ibarra received a subpoena to testify at trial. Before the originally scheduled trial date, she received two letters from Ybarra. In one of the letters, he wrote "a bio-graphy" of what was happening in his case, and that he had been offered a plea bargain with a reduced sentence after she had not appeared to testify. He stated he wanted her to send him to prison. He signed the letter "Love X Dad-e." She interpreted the letter as a threat.

*Defense*
In his defense, Ybarra presented witnesses who testified Ibarra used drugs and had a sexual relationship with Ybarra and Barela while her husband was still alive. A woman who had employed Ibarra as a home care worker testified Ibarra was fired in September 2003 because she was not doing her job, was using drugs, and some jewelry was missing. Ybarra's mother testified she never told Ibarra that Ybarra had a bat and was looking to hurt her or told Ibarra that she would be hurt if she testified against Ybarra.

[Lodgement 7 at 2-6.]

## **Standard of Review**

The instant Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). As amended, 28 U.S.C. § 2254(d) now reads:

-5-

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding.

(emphasis added).

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). See <u>Williams v. Taylor</u>, 529 U.S. 362, 403 (2000). The threshold question is whether the rule of law was clearly established at the time petitioner's state court conviction became final. <u>Id.</u> at 406. Clearly established federal law, as determined by the Supreme Court of the United States at the time of the relevant state-court decision, is found in the Supreme Court's holdings. <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003). However, Ninth Circuit case law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'" <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 2000). Only after the clearly established Federal law is identified can the court determine whether the state court's application of that law "resulted in a decision that was contrary to, or involved an unreasonable application of" clearly established Federal law. See <u>Lockyer</u>, 538 U.S. at 71-72.

A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court handles a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result than the Supreme Court. <u>Williams</u>, 529 U.S. at 405-406. Moreover, a state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct governing legal rule from Supreme Court cases but unreasonably applies it to the facts of the particular state prisoner's case or if the state court either unreasonably extends a legal principle from Supreme Court precedent "to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u> at 407. Under <u>Williams</u>, an application of federal law is unreasonable only if it is "objectively

unreasonable." Id. at 409.  Further, a state court's decision results in a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding" if it "is so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (citations omitted).

In making such a determination under AEDPA, the court looks to the state's last reasoned decision.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  A state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  Early v. Packer, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. Given a highly deferential standard under 28 U.S.C. § 2254(d), federal courts give states courts "the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002), quoting Lindh v. Murphy, 521 U.S. 320, 333 (1997).

## Discussion

The Petitioner presents four claims in the instant petition: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) his due process rights were violated by trial court misconduct in allowing the 911 tapes to be played back to the jury in the jury room; and, (4) the prosecution elicited false evidence and perjured testimony. [Doc. No. 1 at 7-10.] The last reasoned state court decision in this case was that of the California Court of Appeals. [Lodgement 15, *In re Ybarra*, D052782].

### 1. Ineffective Assistance of Counsel (Claims 1, 2)

Grounds one and two of the instant Petition allege ineffective assistance of counsel.  In the first claim Petitioner contends his attorney failed to subpoena and cross-examine the officers responding to the 911 call and his trial attorney failed to redact the 911 tape.  With respect to his second claim, Petitioner alleges his attorney failed to "comb the record" for error by the prosecutor and the trial judge.

1    Ineffective assistance of counsel issues are controlled by the United States Supreme Court

2   decision  in Strickland v. Washington, 466 U.S. 668 (1984).  The Strickland framework for analyzing

3   ineffective assistance of counsel claims is considered to be "clearly established Federal law, as

4   determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d)

5   analysis. See Williams (Terry) v. Taylor, 529 U.S. 362, 404-08 (2000); Bell v. Cone, 535 U.S. 685

6   (2002). Strickland sets out a two-prong test for ineffective assistance of counsel claims.  The burden

7   is on the Petitioner to show (1) counsel's representation fell below an objective standard of

8   reasonableness based on all the circumstances of the case and considered under prevailing

9   professional norms and (2) the deficiencies prejudiced his defense. Strickland, 466 U.S. at 687.

10    In a federal habeas challenge to a state criminal judgment, a state court's conclusion that

11   counsel rendered effective assistance is not a fact binding on the federal court to the extent stated by

12   28 U.S.C. § 2254(d). Both the performance and the prejudice components of the ineffectiveness

13   inquiry are mixed questions of law and fact. See Strickland, 466 U.S. at 698. Claims of ineffective

14   assistance therefore require a review of the record as a whole.

15    A petitioner can make out a claim of ineffective assistance of counsel only by pointing to

16   specific errors made by trial counsel and showing that these errors were not the result of reasonable

17   professional judgment. See United States v. Cronic, 466 U.S. 648, 666 (1984); Strickland, 466 U.S. at

18   690. The proper inquiry for reasonableness of the trial counsel's performance is whether the choices

19   that counsel made were, from trial counsel's own perspective, reasonable at the time. Strickland, 466

20   U.S. at 689; see also Babbitt v. Calderon, 151 F. 3d. 1170, 1163 (9th Cir. 1998).  It is not an inquiry

21   into what defense counsel could have done differently. Id.  The court should consider trial counsel's

22   decisions with a strong presumption that trial counsel's actions resulted from sound strategy and

23   attempt to eliminate the use of hindsight. Id.

24    A habeas petitioner has the burden of showing through evidentiary proof that counsel's

25   deficient performance caused him prejudice. See Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir.),

26   cert. denied, 498 U.S. 960 (1990); see also Rios v. Rocha, 299 F.3d 796, 813 n. 23 (9th Cir.2002)

27   (rejecting two ineffective assistance of counsel claims based on petitioner's failure to produce

28   evidence of prejudice). To establish prejudice, defendant must show that the outcome of the case

1   would have been different had the trial counsel's errors not occurred. <u>Strickland</u>, 466 U.S. at 694.

2   Counsel's errors must rise to the level of depriving the Petitioner of a fair trial. See <u>Williams v.</u>

3   <u>Taylor</u>, 529 U.S. 362, 390 (2000). Additionally, when lack of prejudice is sufficient to dispose of the

4   ineffective assistance of counsel claim, the court need not evaluate the trial counsel's performance for

5   deficiency. *Id* at 668.

6          The California Court of Appeal cited to <u>Strickland</u> and its holding in rejecting the Petitioner's

7   ineffective assistance of counsel claims. We therefore consider whether the state court unreasonably

8   applied the principles of <u>Strickland</u>. <u>Williams</u>, 529 U.S. at 413, 120 S. Ct. 1495.

9                        **a.  Claim 1 - Ineffective Assistance of Trial Counsel**

10          Here, Petitioner claims he experienced ineffective assistance of trial counsel because he did

11   not (1) subpoena or cross-examine police officers who responded to one of the 911 calls or (2) redact

12   statements on the 911 tape claiming that Ybarra was on parole and that he was going to shoot the man

13   who had driven the victim home.

14          The Court has examined the record and the court of appeals decision regarding Petitioner's

15   ineffective assistance of trial counsel claim regarding trial counsel's failure to subpoena or cross-

16   examine police officers who responded to one of the 911 calls.  The Petitioner has never explained

17   the relevance of the testimony from the officers responding to the call, has not shown that his trial

18   counsel's failure to do so fell below an objective standard of conduct to be expected from a

19   reasonably competent attorney and has not shown that the deficiency prejudiced his defense.

20   <u>Strickland</u>, 466 U.S. at 687. Because there is no indication that the testimony would have been

21   probative, trial counsel's failure to cross-examine these witnesses was neither deficient nor

22   prejudicial. <u>Strickland</u>, 466 U.S. at 687, 104 S.Ct. 2052.

23          With respect to the redaction issue, the record reflects that trial counsel did object that the

24   admission of statements on the 911 tape attributed to the nephew's former girlfriend (who was not

25   called as a witness) violated <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).  [Lodgment 15 at 2.]

26   However, the reporters transcripts from the trial show that, in admitting the tape, the court determined

27   the nephew initially talked to the 911 operator and then handed the phone to his girlfriend, the

28   girlfriend was communicating with the nephew in answering the operator's questions (the nephew's

1  voice could be heard in the background relaying answers to the girlfriend, who in turn relayed them

2  to the 911 operator), and the nephew was present to testify and did testify.  Furthermore, at the

3  request of trial counsel, the court admonished the jury that "that was some mention . . . of whether or

4  not the defendant may be on parole or other things.  They have some effect upon the mental status

5  including [the victim], but that is not evidence . . . that's actually true."  Id.

6       Petitioner's trial counsel also sought redaction of the 911 tape to omit the victim's statement

7  that Petitioner "has killed people." [Lodgment 2 at 49-55.].  The state trial judge determined that the

8  victim's belief or knowledge about Petitioner's record was relevant to the criminal threat charge, and

9  emphasized that the jury must be instructed that the victim's statements were relevant only to her

10  perceivable fear and were not to be considered as true fact.[1] [Lodgement 2 at 54-56].  The record

11  indicates that the jury was admonished several times about the relevance of the statements including

12  immediately before and after the victim testified.[2] [Lodgment 2 at 259-60].

13

14       [1]  The state trial judge ruled that Ibarra's belief or knowledge about Petitioner's record –
    whether based on lies, and perhaps unreasonable or not credible – was relevant to whether his
15  threat caused her to be in sustained fear, i.e., one of the elements of the criminal threat charge.
    The trial court emphasized the jury must be told, via stipulation by the parties or instruction by
16  the court, that Petitioner had not killed anyone, or been convicted of such crime, and were not to
    consider the victim's statement as a true fact. (4 RT 54-56.)

17  The record further shows that at trial, immediately after the tape of the 911 call about the slapping
18  incident on February 9, 2004, was played to the jury – in which it was stated Petitioner was on parole
    and said he was going to Barela's house to kill him – the trial court admonished the jury as follows:
19       [T]here was some mention . . . of whether or not defendant may be on parole or other
         things. They have some effect upon the mental status including Ms. Ibarra, but that is
20       not evidence that that's actually true. Just that they said it was true.
         (7 RT 120; see 1 CT 76-80 [People's Ex. 5]; 7 RT 119-21.)

21  The trial judge clarified that Petitioner had not been convicted of murder, cautioning the jury about the
22  limited admissibility of this evidence: "this evidence is only admissible for the effect it has on the
    mind set or belief patterns of this witness, not to say these things are true. I can tell you clearly
23  [Petitioner] hasn't been convicted of murder or anything like that. So just understand that it's
    only for that purpose." (8 RT 324, emphasis added.)

24       [2]  The record further shows that during Ibarra's testimony, the trial court repeatedly
25  admonished the jury. The first admonishment occurred immediately before Ibarra testified about
    what she learned on February 9th from police about Petitioner's dangerousness. The court
26  admonished the jury as follows:
         You know, folks, people can say a lot of things. That doesn't make them true.
27       This is being admitted only for the purpose of explaining whatever affect [sic, effect]
         it had on this witness, not whether the facts are true or not. You must limit it for
28       these purposes.  (8 RT 258-59; see 8 RT 259-60.)

Immediately after Ibarra testified about what she learned from police about appellant's
dangerousness, the trial judge again admonished the jury as follows:

-10-

1    Even if the alleged errors were supported, the Petitioner still does not satisfy <u>Strickland</u>,
2    because he has not met his burden to demonstrate prejudice or to prove that the outcome of the trial
3    would have been different had his trial counsel not committed the alleged errors. There was
4    overwhelming evidence of Petitioner's guilt presented to the jury. The jury heard that Petitioner had
5    pushed the victim and burned her comforter,[3] slapped the victim in the face,[4] telephoned the victim
6    three times on March 3rd threatening to kill her and the people she was with, violently broke the
7    windows of the victim's home,[5] and subsequently sent the victim a threatening letter in the mail
8    during his criminal trial.[6]  In light of the overwhelming evidence of Petitioner's guilt, the Petitioner's
9    vague allegations of ineffective assistance of counsel were reasonably rejected by the California
10   courts. (See Lodgment 15 at 2.)  Given the foregoing, the court of appeal's finding that the Petitioner
11   had not demonstrated that his trial counsel failed to act in a manner to be expected of reasonably
12   competent counsel or that there was prejudice. <u>Id</u>.

13              **b. Claim 2 - Ineffective Assistance of Appellate Counsel**

14   Petitioner further argues that his appellate counsel was ineffective because the counsel failed
15   to "comb the record" for error by the prosecutor and the trial judge.  The Petitioner fails provide any
16   further information beyond this bare allegation to explain how trial counsel failed to act in a manner
17   to be expected of reasonably competent counsel or that he suffered prejudice.  There is, of course, no
18   obligation to raise meritless arguments on a client's behalf. <u>See Strickland</u>, 466 U.S. at 687-88
19   (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for
20   failing to raise a weak issue. <u>See Miller</u>, 882 F.2d at 1434. In order to demonstrate prejudice in this
21   context, petitioner must show that, but for appellate counsel's errors, he probably would have
22   prevailed on appeal. <u>Id</u>. at 1434 n. 9.

23

24    Again, ladies and gentlemen, that's information that she was given others
      believed that may or may not be based on the facts. But it's important to know what
25    her mindset was at this time.  (8 RT 260.)

26    [3]  <u>See</u> 8 RT 250-51, 296.

27    [4]  <u>See</u>  8 RT 254-55.

28    [5]  <u>See</u> 8 RT 264-70.

      [6]  <u>See</u> 8 RT 279-81.

1    The relevant inquiry is not what counsel could have done, rather it is whether the choices

2 made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998). The

3 presumption of reasonableness is stronger for appellate counsel because appellate counsel has wider

4 discretion than trial counsel in weeding out weaker issues and doing so is widely recognized as one of

5 the hallmarks of effective appellate assistance. Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir.1989).

6 Appealing every arguable issue would do disservice to the Petitioner because it would draw an

7 appellate judge's attention away from stronger issues and reduce appellate counsel's credibility before

8 the appellate court. Id. Appellate counsel has no constitutional duty to raise every non-frivolous issue

9 requested by petitioner. Id. at 1434 n. 10 (citing Jones v. Barnes, 463 U.S. 745, 751-54, 103 S. Ct.

10 3308 (1983)).

11    The California Court of Appeal's rejection of the Petitioner's ineffective assistance of counsel

12 claims was reasonable because Petitioner failed to show that his attorneys did not "act in a manner to

13 be expected of reasonably competent counsel or that there was prejudice." [Lodgement 15 at 2.].  The

14 Court finds the that the state appellate court's decision on claims 1 and 2 was not contrary to or an

15 unreasonable application of federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d).

16 As such, the Court recommends that the Petitioner's claims of ineffective assistance of counsel,

17 claims 1 and 2 of the Petition, be DENIED.

18    **2. Court Misconduct (Claim 3)**

19    The Petitioner's third claim is that his due process rights were violated by court misconduct.

20 Specifically, the Petitioner contends the judge erred by permitting the 911 tapes to be played in the

21 jury room allowing the jury to hear the caller say that Petitioner kills people and that he was on

22 parole. However, the state court record clearly shows that the trial judge, by allowing the playback,

23 properly allowed the jury to consider evidence that had been presented at the trial, evidence that was

24 probative on the issue of Ibarra's fear of Petitioner pertinent to the criminal threat charge, and

25 evidence whose limited purpose was addressed in various jury admonishments given by the trial

26 judge.

27    It is within the trial judge's discretion to entitle jurors to examine documents properly

28 admitted into evidence.  United States v. DeCoito, 764, F.2d 690, 695 (9th cir. 1985).  In this case,

the trial judge admitted the 911 call tapes as evidence of the victim's state of mind and not for the

1   truth of what the victim said when she called 911.  Furthermore, the jury was admonished to this

2   effect, and was cautioned about the limited admissibility of this evidence.

3           The California Court of Appeal properly rejected Petitioner's court misconduct claim

4   because: 1) defense counsel notified the court that he had no objection to the tapes being replayed to

5   the jury; and 2) it is within the court's discretion to allow jurors to examine admitted evidence.  The

6   California Court of Appeal's rejection of Petitioner's court misconduct claim is not contrary to or an

7   unreasonable application of federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d).

8   As such, the Court recommends that the Petitioner's claim of violations of his due process right as a

9   result of court misconduct, claim 3, be DENIED.

10          **3.  Prosecutorial Misconduct (Claim 4)**

11          In his last claim, Petitioner alleges his due process rights were violated by prosecutorial

12  misconduct.  Specifically, Petitioner claims the prosecutor engaged in misconduct by eliciting

13  perjured testimony that the police officers told the victim about Petitioner's record when the

14  prosecutor allegedly knew the police report showed that Petitioner's last name was then unknown to

15  the police.  Respondent contends the trial transcript indicates that the victim admitted to giving the

16  police Petitioner's last name and that the victim's testimony contradicts Petitioner's claim.

17  Respondent also argues assuming that the prosecutor did err, that such error did not result in a due

18  process violation to Petitioner.

19          Clearly established federal law provides that "[t]o constitute a due process violation, the

20  prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's

21  right to a fair trial.'"  Greer v. Miller, 483 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473

22  U.S. 667, 676 (1985)).  The misconduct must be reviewed in the context of the entire trial.  Donnelly

23  v. DeChristoforo, 416 U.S. 637, 643 (1974).

24          During the victim's testimony she stated, "I'm almost sure that I did give the last name . . . I

25  had to have given it to them," which directly contradicts Petitioners claim that the police officers did

26   not know Petitioner's last name.  Even if the evidence was misleading, Petitioner has not offered any

27  proof that the presentation of misleading evidence rendered the proceeding fundamentally unfair and

28  therefore violated his due process rights. See Panther v. Hames, 991 F.2d 576, 582 (9th Cir.1993)

1   (holding that prosecutorial misconduct in presenting false evidence to the grand jury did not render

2   grand jury proceeding fundamentally unfair in violation of due process).

3          As previously discussed, there was overwhelming evidence presented at trial establishing the

4   Petitioner's guilt, making it apparent that petitioner has failed to establish that the alleged

5   prosecutorial misconducted resulted in actual prejudice.  Johnson v. Sublett, 63 F.3d 926, 930 (9th

6   Cir. 1995) (citing Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993) (establishing that relief is

7   limited to when the petitioner can establish that the misconduct resulted in actual prejudice).

8          The California Court of Appeal rejected Petitioner's prosecutorial misconduct claim because

9   the claim is speculative and contradicted by victim testimony.  The California Court of Appeal

10  decision was reasonable and not contrary to or an unreasonable application of clearly established

11  federal law because the record indicates victim testimony contradicting the Petitioner's claim, and

12  Petitioner has failed to establish that actual prejudice occurred given the other evidence of his guilt.

13  For these reasons, the Court recommends that the Petitioner's claim of prosecutorial misconduct,

14  claim 4, be DENIED.

15  **4. Petitioner's Request For An Evidentiary Hearing**

16         On January 5, 2010 Petitioner submitted a motion for an evidentiary hearing.   Petitioner state

17  that the hearing is necessary  to obtain evidence regarding the 911 tapes with the goal of proving: (1)

18  his trial attorney failed to redact the tapes, and (2) a substantial and injurious error by the trial judge

19  occurred when the judge allowed the tapes to be replayed to the jury during deliberation without

20  additional instructions.  Petitioner also seeks an evidentiary hearing to obtain evidence from the

21  police officers who responded to the February 9, 2004, 911 call to offer support for his claim of

22  prosecutorial misconduct, in which the Petitioner contends the prosecutor allowed perjury to go

23  uncorrected. [Doc. No. 27].

24

25

26

27

28

1   Absent the narrow exceptions set forth in 28 U.S.C. § 2254(e)(2),[7] a federal court is prohibited

2   from holding an evidentiary hearing if the petitioner was not diligent in attempting to develop the

3   factual basis of a claim in state court. Willaims v. Taylor, 529 U.S. 420, 435, 120 S. Ct. 1479, 146

4   L.Ed.2d 435 (2000). If a hearing is not barred under section 2254(e)(2), a federal district court must

5   hold an evidentiary hearing if (1) the petitioner alleges facts which, if proved, would entitle him to

6   relief, and (2) the state court has not "reliably found the relevant facts" after a "full and fair

7   evidentiary hearing" at trial or in a collateral proceeding. Houston v. Shornig, 533 F.3d 1076, 1083

8   (9th Cir. 2008) (citing 28 U.S.C. § 2254(e)(2); Alberni v. McDaniel, 458 F.3d 860, 873 (9th Cir.

9   2006)).

10   "In deciding whether to grant an evidentiary hearing, a federal court must consider whether

11   such a hearing could enable an applicant to prove the petitioner's factual allegations, which, if true,

12   would entitle the applicant to federal habeas relief."  Schriro v. Landrigan, 550 U.S. 465, 474 (2007)

13   (citing Mayes v. Gibson, 210 F.3d 1284, 1287 (10th Cir. 2000)).  The Court is not required to hold an

14   evidentiary hearing where "the record refutes the applicant's factual allegations or otherwise

15   precludes habeas relief . . . ."  Id.; see also Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999);

16   Totten v. Merkle, 137 F.3d 1172, 1176 (1998).  Here, even assuming diligence, the Petitioner's

17   claims, as discussed above, do not entitle him to relief.  Accordingly, no hearing is required or

18   necessary.  The Petitioner's request for an evidentiary hearing is DENIED.

19   **Conclusion**

20   For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the Court issue an

21   Order: (1) approving and adopting this Report and Recommendation; and (2) directing that

22   judgement be entered denying the Petition.

23

---

24   [7]  The exceptions allow a petitioner to obtain a hearing if he can establish one of the following:

25   (A) the claim relies on --

26       (i) a new rule of constitutional law, made retroactive to cases on collateral review
    by the Supreme Court, that was previously unavailable; or

27       (ii) a factual predicate that could not have been previously discovered through
    the exercise of due diligence; and

28   (B) the facts underlying the claim would be sufficient to establish by clear and
convincing evidence that but for constitutional error, no reasonable factfinder would
have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

1         This Report and Recommendation will be submitted to the United States District Judge

2    assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (1988). Any written

3    objections to this Report and Recommendation must be filed with the Court and a copy served on all

4    parties **on or before August 25, 2010**.  The document should be captioned "Objections to Report and

5    Recommendation." Any reply to the objections shall be served and filed **on or before September 7,**

6    **2010**.  The parties are advised that failure to file objections within the specified time may waive the

7    right to raise those objections on appeal of this Court's order. *See Turner v. Duncan,* 158 F.3d 449,

8    455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

9         IT IS SO ORDERED.

10

11   DATED:  August 6, 2010

12                                      _____

                                        Hon. Anthony J. Battaglia

13                                      U.S. Magistrate Judge

                                        United States District Court

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28